**ARMOUR AND COMPANY, a Delaware Corporation, Plaintiff,**

v.

**SWIFT & COMPANY, a Delaware Corporation, Defendant.**

**No. 67 C 1829.**

United States District Court, N. D. Illinois, E. D.

Nov. 27, 1970.

Richard E. Alexander, Peter N. Jansson, Carl C. Batz and Frank T. Barber, Alexander & Speckman, Chicago, Ill., for plaintiff.

Edward A. Haight, Britton A. Davis and Rolf O. Stadheim, Haight, Hofeldt & Davis, Chicago, Ill., for defendant; Edward T. McCabe, Chicago, Ill., of counsel.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

PERRY, District Judge.

This action came on for trial before the court without a jury. The issues were duly tried and the court heard oral argument of counsel for the parties. Post-trial briefs were filed by the parties and the court has read and considered them. Now, being fully advised in the premises, the court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. This is a patent infringement action brought by Armour and Company against Swift & Company for infringement of United States Letters Patent 3,285,752.

2. Armour and Company is a Delaware corporation and Swift & Company was chartered under the laws of the State of Illinois at the time the Complaint was filed but later became chartered under the laws of Delaware.

3. The jurisdiction of this Court arises under the patent laws of the United States, Title 35, United States Code, and under Title 28, United States Code, Sections 1338(a) and 1400(b).

4. Patent No. 3,285,752 was issued to plaintiff on November 15, 1966 on an application filed March 16, 1964 by Leo J. Hansen, Donald V. Schwall and Jay T. Colburn. Plaintiff at all times has been the owner of all the right, title and interest in, to and under the said Letters Patent.

*The Hansen et al. Patent*

5. The Armour patent in suit deals with a method of preparing a poultry

product made up of a plurality of pieces or chunks of poultry meat in the form of a log, roll, roast, or canned product.

6. The patent summarizes the process as follows (Col. 1, lines 48–54):

"Stated in general terms, the process of the present invention comprises the steps of applying edible metallic salt, such as sodium chloride, to the surfaces of pieces or chunks of poultry meat, agitating or tumbling the said pieces or chunks until a concentration of salt soluble protein is formed on the surfaces thereof, pressing the said pieces together, and then cooking."

7. The claims of the patent further limit the scope of the invention to a process wherein the edible metallic salt is applied at a level within the range of .1 to 2.0% of the poultry meat, and wherein agitation is carried out at a temperature within the range of 25 to 70°F. Claim 1 is illustrative:

"1. A method of preparing a poultry product comprising the steps of slaughtering and aging poultry, applying to the surface of raw pieces of said aged poultry edible metallic salt which can form, with the natural moisture in the poultry meat, a solution capable of extracting salt soluble proteins from said meat to provide a surface coating thereof, said edible metallic salt being applied in a concentration within the range of .1 to 2.0% based on the weight of said poultry pieces, agitating said pieces at a temperature within the range of 25 to 70° F. until a concentration of salt soluble protein is formed on the surface thereof, and pressing said pieces together to form a unitary body characterized by its improved resistance to water cook-out and its retention of intact sliceability after cooking."

8. The objectives to which the patent is directed are the production of a poultry product characterized by improved resistance to water cook-out and good sliceability after cooking.

9. The term "aging", as used in the claims of the patent, is defined in the specification "in the sense ordinarily employed in the poultry industry, where the aging period is generally referred to as corresponding to the length of time required for poultry to pass through rigor mortis". "Aging also corresponds generally to the period of time required after slaughter to remove body heat from poultry immersed in the conventional ice slush tanks utilized in poultry processing plants" (Col. 3, lines 8–19).

10. "Edible metallic salt", as used in the claims of the patent, is described in the specification as including sodium chloride, potassium chloride, and various phosphates (Col. 3, lines 62–63).

11. "Agitating", as used in the claims of the patent, is described in the specification as "any type of mixing, tumbling, or working action which manipulates or rubs the salt onto or into the raw poultry meat surface" (Col. 4, lines 7–9).

12. "Pieces" of poultry, as used in the claims of the patent, are not described or defined in the specification in terms of size or weight. The patent purports to cover the use of any size piece in the process.

13. As to the technical basis on which the Armour patent is predicated, the patent states (at Col. 2, lines 58–66):

"The present invention is based in part on the discovery that passing through rigor mortis has little or no effect on the amount of salt soluble protein which can be extracted from poultry, and particularly from the white meat of poultry. In other words, it has been found that poultry possesses a high level of salt extractable protein immediately following slaughter and that this high level is maintained even after the onset and resolution of rigor mortis."

*The Prior Art*

14. Prior to the invention claimed in the Armour patent, Russell Maas of Os-

car Mayer & Co. in Madison, Wisconsin had discovered a process wherein pieces or chunks of chilled raw meat were mixed in the presence of 2.0% chloride and/or phosphate salts until a creamy, tacky exudate formed on the surfaces of the meat pieces, which pieces were then pressed together in a form or container and cooked to produce a product having resistance to cook-out and intact sliceability after cooking.

15. The Maas process was the subject of a patent application filed October 7, 1959, now abandoned, and a continuation-in-part application filed July 3, 1961 which eventually matured into U.S. Patent 3,076,713 issued to Oscar Mayer & Co. on February 5, 1963.

16. The Maas patent, 3,076,713, was considered as prior art by the Patent Office during the prosecution of the application which matured into the Armour patent in suit. While conceding that the "creamy, tacky exudate" described in the Maas patent was salt soluble protein, Armour urged the allowance of the Hansen et al. application over the Maas reference on the basis of two distinctions: First, Armour pointed to the fact that, although Maas had claimed his invention with the generic term "meat", he described the process with pork, beef, mutton, veal, lamb and venison, and did not mention poultry. Secondly, Armour urged that, although Maas had described his "meat" as "fresh" meat "chilled under normal operating conditions", he was in fact referring to meat which had not passed through rigor mortis.

17. After first rejecting these arguments of Armour and denying the patent over the Maas reference, the Patent Office relented and allowed the patent after Armour filed affidavits of two professors of poultry science, Dr. Lawrence Dawson and Dr. Richard Forsythe, stating (1) that the differences between red meat and poultry meat were such that one could not predict how poultry meat would behave from prior experience with red meat, and (2) that although red meat had been adhered with salt and agitation, the phenomenon had occurred only in connection with pre-rigor mortis red meat, and because of a lack of sufficient extractable salt soluble proteins, had not been tried or believed practical in connection with post-rigor mortis red meat.

18. Prior to August of 1962, when Hansen et al. began working on the subject matter disclosed in the Armour patent, Maas had tested the process steps of Patent 3,076,713 to determine if they were applicable to poultry meat. The evidence establishes that Maas, and his coworker at Oscar Mayer, Burdette Biddick, as early as December 22, 1960, mixed 20 pounds of light and dark turkey meat at a temperature of 45°F. with 2% salt for eight minutes. A tacky exudate was formed on the surfaces of the poultry pieces, which were then pressed into a casing and frozen. The roasts held together after cooking. This constitutes a prior invention and reduction to practice of the process claimed by Armour.

19. The process, thus conceived and reduced to practice at Oscar Mayer in December, 1960, was not abandoned, suppressed or concealed. Beginning in 1964, Oscar Mayer has regularly sold in commerce a sliced turkey breast meat product manufactured in accordance with that process.

20. The invention claimed by Armour also lacks novelty over the work of Professor Robert Baker and his associates at Cornell University. Beginning in about 1959, Dr. Baker began to look for new market outlets for poultry products, and received a grant to pursue such work. One of the market outlets which he determined to investigate was in the area of frankfurters and sausage.

21. After consulting with various manufacturers of red meat franks and sausage to learn how those products were made, Dr. Baker applied the same process to produce chicken franks, chicken bologna and chicken chunk rolls. The process which Dr. Baker employed included the steps of (1) grinding or comminuting the raw poultry meat into small pieces, (2) mixing the meat at a

low temperature in the presence of salt until salt soluble proteins had concentrated in sufficient quantities to make a sticky mass or emulsion, (3) pressing the mass into casings, (4) cooking and, where desired, (5) slicing the product for sale to consumers. In the case of the chicken chunk roll, larger pieces of raw chicken (up to an inch square) were separately mixed with salt prior to their incorporation into the emulsion.

22. The chicken franks, chicken bologna and chicken chunk rolls were developed and successfully made at Cornell in 1960, 1961 and 1962. Chicken franks were sold to the public in a market test conducted in Ithaca, New York supermarkets in the fall of 1960, and were the subject of a Cornell bulletin published in January, 1961. Chicken bologna (and "chickalona") in a slice pack were sold and market tested in Ithaca and Syracuse in the Summer of 1961, and were the subject of a Cornell bulletin published in January, 1962. These products were also served to those who attended the First New Poultry and Egg Products Conference at Cornell in September, 1962. Chicken chunk rolls, though developed and made by Dr. Baker as early as March, 1960, were not sold or market tested until 1964 or described in a publication until 1965.

23. The products which Dr. Baker and his associates at Cornell made, sold and published prior to August of 1962 were different from turkey roasts and rolls which Armour has commercialized in that, in Dr. Baker's products, poultry meat was ground to a fine particle size prior to mixing with salt and the formation of an emulsion, sausage-type product. The process which Dr. Baker used and described in his publications, however, included each of the steps of the invention claimed in the Armour patent, utilized the same phenomenon in the same way to achieve binding, and was an anticipation of it.

24. Prior to the invention claimed by Hansen et al. in the Armour patent, it was known to Hansen and to the art in general, that in making conventional red meat sausage, agitation of finely ground pieces of post-rigor red meat in the presence of salt causes salt soluble proteins to be liberated from the meat. It was further known to Hansen and to the art that upon pressing the meat into casings and cooking, it is the salt soluble proteins which coagulate and provide the binding effect in the product.

25. The primary difference between the red meat sausage art and the invention claimed by Armour is that the latter is limited specifically to poultry meat. In red meat sausage, the meat pieces are usually finely comminuted, and fat and water are added to produce an emulsion type product.

26. As stated in previous findings 20 through 23, the salt-agitation technique utilized in red meat sausage had, prior to the alleged invention claimed by Armour, been adapted for use in the making of poultry products. The work of Dr. Baker of Cornell in making chicken franks and chicken bologna had been published; products made by salt-agitation method had been sold to the public. As in the case of red meat sausage, the meat was ground, salt and water were added, and an emulsion-type product resulted. Persons skilled in the art knew that salt soluble protein was responsible for the binding effect.

27. As stated in previous findings 14–19, Russell Maas of Oscar Mayer had, prior to the alleged invention of Armour, developed a method whereby larger pieces of meat were mixed in the presence of salt to cause the liberation of salt soluble proteins and the formation of products having the appearance and texture of whole pieces of meat. The process was described by Maas in a patent application which matured into Patent 3,076,713.

28. In October, 1960, Oscar Mayer was awarded a contract with the Military Subsistence Supply Agency of the United States Government to produce and supply over 200,000 pounds of a sliced and canned pork steak product made in accordance with the process described in the Maas patent. In filling

the order for delivery between January 1 and March 15, 1961, fresh pork loins were boned and cut into pieces weighing between 1¾ and 2¼ pounds each, the pieces were mixed with 0.8% salt until a tacky exudate was formed on the pieces, and the pieces were stuffed into a casing, frozen, and sliced. Upon cooking, the individual slices could be cut cold or hot and each held together without separation or breaking apart. Post-rigor meat was used.

29. The process used in the prior sale to the Government of products made in accordance with the Maas patent differed from the process claimed in the Armour patent only in that pork and not poultry meat was used.

30. Other prior art further demonstrates the level of skill in the art, and the predictability of successfully applying the process used at Oscar Mayer on red meat to make a similar poultry product. For example, Professor Whitaker of the University of California had, as early as 1959, noted in an article in Advances in Food Research, Vol. 9, p. 21, that "in general, the chemical changes following death are qualitatively the same (in chicken muscle) as in the mammalian species." Professor Stadelman of Purdue University had, in 1962, reported to the First New Poultry & Egg Products Conference at Cornell University that "in general composition, poultry meat follows very closely figures you might have for beef or lean pork", and that "actually, in most of our new products work using poultry meats, we will be coming up with copies of products that are currently or at some time in the past have been produced using meats from the larger animals".

31. More specifically, the art prior to Hansen et al. had acquired the knowledge that, like red meat, there was salt soluble protein in poultry, and that, as in the case of red meat products, such salt soluble protein could be liberated from raw poultry pieces to bind the ingredients. Dr. Mahon, of the Calgon Co., had advised the 1962 First New Poultry and Egg Products Conference

that, in the making of raw turkey logs, the use of an edible phosphate salt (KENA) would increase the amount of soluble, heat-coagulable protein derived from the meat and contribute to better binding.

32. The prior art Weinberg & Rose article, "Changes in Protein Extractability During Post-Rigor Tenderization of Chicken Breast Meat", Food Technology, 1960, Vol. 14, p. 376, and the published paper of Dr. Robert Fischer, given at the Campbell Soup Symposium in January, 1963, each discloses, on the basis of laboratory tests, that the concentration of extractable salt soluble proteins in poultry muscle increases during the aging process. The reported data, in each case, shows that the post-rigor extracts contain more of the total of myosin and actomyosin than did the pre-rigor extractions.

33. In light of the scope and content of the prior art discussed above; such differences between the prior art and the invention claimed by Hansen et al., as have been stated above; and the level of skill in the art of meat technology; the Court finds that the process defined in claims 1 through 7 of the Armour patent in suit would have been obvious to one of ordinary skill in the art at the time the alleged invention of the patent was made.

*The Patent Is Invalid*

34. The file history of the prosecution of the Armour patent indicates that the Patent Office did not consider all of the pertinent prior art in allowing the patent. The prior work and sales of Dr. Baker of Cornell, and the publications disclosing it, are nowhere mentioned. Nor were the prior work of Maas on poultry or the prior sale by Oscar Mayer before the Patent Office. Also absent was any consideration of the published articles of Hansen, Fischer, Stadelman and Mahon.

35. The presumption of validity is weakened due to the fact that pertinent prior art was not considered by the Pat-

ent Office. The presumption is overcome by the foregoing evidence.

36. The Armour products made by the patented process have enjoyed some success in the market. They have not replaced prior conventional turkey rolls and roasts, and sales have accounted for only a small percentage of the total sales of further processed turkey. This is so notwithstanding considerable advertising and promotion by Armour of the products in question.

37. Armour refers to laboratory failures of Swift's research worker, Strandine, as being indicative of invention by Hansen et al. The evidence which shows that Dr. Strandine made numerous laboratory investigations of methods for binding poultry products, is tempered by the fact that much of his work was devoted to products dissimilar to those here in question, and in which the salt-agitation method disclosed in the Armour patent would be inapplicable. Some of these products are still being successfully marketed by Swift. Moreover, Dr. Strandine did not know of the prior patented process of Maas at the time he was called upon to develop a process for making a turkey roast similar to that being marketed by Armour.

*The Patent Office Proceedings*

38. During the prosecution of the application which resulted in the Armour patent, the applicants petitioned the Patent Office for "Special Status" under a specific examining procedure approved by the Commissioner of Patents. In order to facilitate prompt action on its application and to comply with the special procedure, Armour undertook more than the usual obligation of frank and truthful disclosure. It was obligated to conduct a pre-examination search of the prior art, to submit to the Patent Office a copy of all prior references deemed pertinent, and to furnish a detailed discussion of each.

39. In purporting to comply with the procedure applicable to its request for special status, Armour called the Patent Office's attention to various patents and publications, and submitted copies and a discussion thereof. Among those cited were the Maas patent and eight references said to relate to red meat sausage.

40. At the time it submitted the results of its search to the Patent Office, Armour knew of the work of Dr. Baker at Cornell on poultry sausage, and knew of the Cornell publications which described the process used by Dr. Baker to make chicken franks and chicken bologna. Armour did not, however, call the Patent Office's attention to this prior art. The Cornell prior art is more pertinent to the invention claimed in the Armour patent than are the red meat sausage references to which the Patent Office's attention was directed.

41. In addition to the Cornell publications, Armour had, during the prosecution of the patent application, knowledge of the publications of Dr. Stadelman of Purdue, Dr. Mahon of Calgon Co., of Professor Whitaker of the University of California, and of Weinberg & Rose, previously referred to in Findings 30–32. It also had knowledge that in the work which led to the invention claimed in the Armour patent, Dr. Hansen had suggested to his co-patentee that the desired binding effect might be achieved by the same phenomenon previously utilized in red meat sausage manufacturing and known to Hansen through his experience at Oscar Mayer. This prior art and these facts were pertinent by reason of Armour's representations to the Patent Office that red meat experience cannot be used to predict results with poultry, and that accordingly the process claimed by Armour was unobvious. The Weinberg & Rose and Mahon references are further pertinent in that they disclose that salt soluble proteins can be extracted from poultry in undiminished quantities after rigor mortis, and are useful to achieve binding.

42. With the exception of the Weinberg & Rose and Whitaker references, none of the prior art or facts set forth in the foregoing finding were brought to the attention of the Patent Office by

Armour. With respect to the Whitaker article, Armour cited only pages 31 and 32, and not the comments on page 21, regarding the similarity between red meat and poultry. With respect to the Weinberg & Rose reference, Armour called attention only to its disclosure that myosin extractability from poultry decreases after rigor mortis, and not to an increase in extractability of all salt soluble proteins, including actomyosin, after rigor mortis. Armour did not supply the Patent Office with copies of either Whitaker or Weinberg & Rose, and did not submit a detailed discussion of either, as the Patent Office rule referred to above required.

43. Armour's failure to call the Patent Office's attention to prior art as referred to in findings 40 to 42, and to submit copies and a detailed discussion as required by the aforesaid rule of the Patent Office, transgresses the standards of candor and truthfulness required of applicants for patents. The Court finds that Armour breached its duty of disclosure to the Patent Office.

44. During the prosecution of the Armour patent, Armour also made affirmative representations to the Patent Office which were less than candid, and misleading. When, for example, the Weinberg & Rose article came to Armour's attention, Armour stated to the Patent Office that "it is clearly taught in the art that myosin is the salt extractable protein responsible for the binding effect." This representation enabled Armour to then cite the Weinberg & Rose reference as though it supported patentability, since Weinberg & Rose do show a reduction in the myosin fraction of salt soluble proteins after rigor mortis. It also enabled Armour to ignore the fact that Weinberg & Rose showed an increase in actomyosin extractability post-rigor, as well as an increase in total salt soluble proteins.

45. The representation that the art taught that myosin is the protein responsible for binding is both inaccurate and misleading. The Turner and Olson patent which Armour cited in support of

its representation does not so teach. Armour made no independent attempt to verify that myosin is, in fact, the particular salt soluble protein responsible for binding. The evidence at the trial showed that actomyosin is the more significant salt soluble protein responsible for binding. The evidence also establishes that one of Armour's patentees, Leo Hansen, knew from work he performed at Oscar Mayer Co. before his employment by Armour, that the binding effect results only after the association of myosin and actin to form actomyosin. Armour's representation to the Patent Office was contrary to these facts and was knowingly misleading.

46. In its patent application, filed March 16, 1964, Armour stressed that its process was applicable only to poultry meat, and urged patentability on the basis of prior work on red meat. It stated that—

"* * * earlier work on the red meat of animals such as beef, pork, veal and the like had indicated that there were limiting factors on the extraction of salt soluble proteins from meat which would make it impossible for the process to be applied in the regular commercial processing of poultry meat."

and that

"Thus, in red meat animals which have passed through rigor mortis, the salt soluble proteins can be extracted in sufficient quantities only if high salt concentrations and vigorous agitation are used."

47. These representations were carried into the Armour patent, which issued on November 15, 1966. The patent further states that when the process is applied to poultry, highly effective results are achieved—

"* * * which would not have been expected in view of previous experience on red meat."

48. Though purporting to be predicated on "earlier work" and "previous experience", the accuracy of these factual representations to the Patent Office

had not been established or confirmed by any test or experience of the patentees or by Armour.

49. In initial remarks, prior to any action by the Patent Office, Armour repeated its representations that the process was not applicable to post-rigor red meat. As to the Maas patent, it urged that Maas' work was limited to pre-rigor meat. Armour stated:

"Although it has been previously disclosed (e. g., Maas 3,076,713) that chunks or pieces of meat from *red meat* animals can be bound together by tumbling the pieces in the presence of salt to develop the adhesiveness of salt-soluble proteins, the present invention is based on a substantially different phenomenon. That is, the present invention involves the use of *poultry meat* which has been *aged*, whereas all the prior art work has been with *red meat* which is *un-aged*."

50. In its first response, the Patent Office rejected the application, citing the Maas patent and stating:

"It is to be noted that applicant urges that the Maas reference 'teaches only the treatment of pre-rigor mortis meat.' Issue must be taken with this statement. No basis is in fact evident for such an assumption."

51. In response to this rejection, Armour again repeated its representation that there is not sufficient salt soluble protein available for binding pieces of post-rigor mortis red meat, and again urged that the Maas patent be read as disclosing only pre-rigor mortis meat. On this occasion, Armour filed the affidavits of Professors Dawson and Forsythe to support its position. The Dawson affidavit states:

"Although red meat was known to behave in this manner, the phenomenon has occurred only in connection with pre-rigor mortis red meat, and to my knowledge has not been tried or believed practical in connection with aged, or post-rigor mortis red meat. * * * Under these conditions there is not sufficient salt soluble protein available for the binding of pieces of post-rigor mortis red meat, and to my knowledge there has not been any attempt to practice the process commercially with respect to aged, or post-rigor mortis red meat."

52. Thereafter, the Patent Office allowed Armour's application. The foregoing representations were material to the outcome. Those representations, shown to be erroneous, were not based on any tests or factual knowledge of Armour or of the affiants.

53. The representations of Armour and its affiants regarding the unavailability of salt soluble proteins to bind post-rigor mortis red meat were contrary to fact. The evidence before the Court demonstrates that when pieces of ordinary post-rigor red meat from beef, lamb, and pork are agitated, as directed in the Armour patent in suit, in the presence of 2.0% or less salt, salt soluble proteins concentrate on the surfaces of the meat pieces in sufficient quantities to cause the pieces to adhere together and to bind the product so that after cooking it can be sliced.

54. Prior to the filing of the affidavits of Professors Dawson and Forsythe in support of its representations regarding red meat, research workers at Armour other than Hansen et al. had demonstrated that pieces of post-rigor mortis red meat could be bound together and sliced through application of the salt-agitation technique. Those associated with the Hansen et al. application either knew, or should have known, of these tests by other Armour personnel. The same attorney in Armour's patent department was concurrently prosecuting both applications. Armour's failure to call these facts to the attention of the Patent Office, and its reliance on the opinions of Professors Dawson and Forsythe to establish the contrary, demonstrates a breach of Armour's obligation of candor to the Patent Office.

55. Also contrary to the statements of Armour to the Patent Office, the Maas patent cannot properly be read as

pertaining only to pre-rigor mortis red meat. Maas makes no mention of rigor mortis and defines his meat as that which has been "chilled under normal operating conditions." Meat which has been chilled under normal operating conditions has passed through rigor mortis. Those skilled in the art would know this and, in the absence of the Dawson and Forsythe affidavits, would read the Maas patent in accordance with its plain meaning, i. e., that Maas was speaking of ordinary meat, and not of exceptional pre-rigor mortis muscle tissue.

56. Armour's representations to the Patent Office regarding the unsuitability of post-rigor mortis red meat and the interpretation of the Maas patent as pre-rigor, were made with the knowledge and cooperation of Leo Hansen. Hansen had been employed from March of 1957 to April of 1962 in the same research laboratory of Oscar Mayer in which Maas developed and perfected the process of his patent. While at Oscar Mayer, Hansen had participated in Maas' work, had requested and received products made in accordance with Maas' principles, and had evaluated such products. Hansen knew that there was sufficient salt soluble protein available in post-rigor mortis red meat to bind, and knew that the Maas patent was applicable to post-rigor mortis meat.

57. In view of Hansen's knowledge derived from his prior work at Oscar Mayer, Armour's representations to the Patent Office regarding the ability of salt soluble proteins in post-rigor mortis red meat to bind, and the interpretation of the Maas patent, were falsely and knowingly misleading.

58. Taken as a whole, Armour's conduct in the prosecution of the application for the patent in suit demonstrates a calculated willingness to omit and withhold facts from the Patent Office. This conduct constitutes unclean hands such as to bar Armour's right to the relief it here seeks.

(No finding numbered 59.)

## The Alleged Infringement

60. Armour charges that Swift infringes the patent since its issuance on November 15, 1966 by the use of a process to make Swift 2 pound turkey pan roast, 2 pound ham and turkey roast, and institutional turkey rolls. Prior to March 16, 1967, Swift manufactured its 2 pound turkey pan roast and institutional turkey roll by a process which, as specified in the claims of the Armour patent, included the steps of first applying salt to the new turkey pieces and then agitating the pieces until a concentration of salt soluble proteins formed on the meat surfaces. When the Armour patent issued and came to Swift's attention, Swift took action to avoid practicing the process, as thus defined in the patent. Subsequent to March 16, 1967, each of the accused Swift products has been manufactured with a process wherein the meat pieces are first agitated without the addition of salt until a concentration of salt soluble proteins forms on the meat surfaces, and salt is thereafter added to the meat for flavor and other purposes. This process avoids a critical limitation in the claims of Armour's patent.

61. In addition, each of the claims of the Armour patent contains a limitation that the edible metallic salt employed in the process shall be applied in a concentration within a range not to exceed 2.0% based upon the weight of the poultry pieces. Claim 1 and dependent claims 3, 4 and 5 define such salts as those which can form a solution capable of extracting salt soluble proteins. Claims 2, 6 and 7 specify the exclusive use of a particular sodium salt. The 2.0% maximum limitation was inserted in the claims by an amendment which effectively cancelled all of the claims which Armour originally sought in its application, and in which the maximum salt level was either not specified, or was said to be 2.5%

62. In each of the Swift products, except the 2 pound Ham and Turkey Roast, edible metallic salt comprised of

sodium chloride and sodium phosphates (KENA) is employed at a level which exceeds 2.0% based on the weight of the poultry pieces. Armour is estopped by reason of the history of its patent application to claim infringement of its patent by these products. The 2 .pound Ham and Turkey Roast was not manufactured commercially until after March 16, 1967, when Swift changed its process procedures to avoid infringement of the patent.

63. Armour has not sustained its burden of proving infringement.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the subject matter and the parties.

2. U.S. Patent No. 3,285,752 lacks novelty and is invalid under 35 U.S.C. § 102(g).

3. U.S. Patent No. 3,285,752 lacks novelty and is invalid under 35 U.S.C. § 102(b).

4. The subject matter of U.S. Patent No. 3,285,752 would have been obvious to a person having ordinary skill in the art at the time the invention was made, and the patent is thereby invalid under 35 U.S.C. § 103.

5. Plaintiff's unclean hands during prosecution of U.S. Patent No. 3,285,752 renders the patent unenforceable.

6. Defendant is entitled to a judgment dismissing the Complaint with prejudice and an award of costs.

## JUDGMENT

This action came on for trial before the court, and the issues having been duly tried, and the court having this day entered simultaneously herewith its Findings of Fact and Conclusions of Law, in accordance therewith

It is ordered and adjudged:

1. That United States Patent No. 3,285,752, and each of the claims thereof, is invalid and unenforceable.

2. That the defendant, Swift & Company, has not infringed any claims of U.S. Patent No. 3,285,752.

3. That the Complaint herein be and it is hereby dismissed on the merits.

4. That the defendant, Swift & Company, recover from the plaintiff, Armour and Company, its costs herein to be taxed by the Clerk of the Court and that execution issue therefor.